# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5577-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.W.,

    Defendant-Appellant,

and

C.L.,

    Defendant.

_____

IN THE MATTER OF N.L.,

    a Minor.

_____

Submitted October 8, 2019 – Decided October 29, 2019

Before Judges Gilson and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0439-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Sara K. Bennett, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant A.W. appeals a finding in this Title Nine action that she abused or neglected her eleven-year-old child, N.L. (Natalie),[1] by leaving her unattended at a Division of Child Protection and Permanency office for placement in foster care. Because we conclude there was sufficient credible evidence in the record supporting the judge's decision, we affirm.

At a two-day fact-finding hearing, the Division presented the testimony of its investigator, Heather Nutter, and intake supervisor, Heather Watts.

---

[1]  We use initials and pseudonyms to identify the parties for ease of reference and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

Defendant testified on her own behalf, and presented the testimony of her nineteen-year-old daughter, N.D. (Nora).

The allegations of abuse or neglect arise from defendant's frustrated attempts to redress Natalie's undisputed, long-standing behavioral problems. According to Nutter, the family's history with the Division began in 2011. A few years later, when Natalie was nine years old, defendant brought her to a Division office, "asking for the child to be placed because [defendant] was overwhelmed with [Natalie's] behavior." Apparently, Nutter and Watts then became involved with the family. The Division provided services, including counseling for Natalie. The child refused to listen to her mother and teacher, often running away from home and school.

On the incident date, a Division clerical worker brought Natalie to Nutter's office on the second floor of the Wilentz Justice Complex. Natalie had three bags containing clothing, toiletries and a towel in her possession, but she was unaccompanied by defendant or a guardian. Nutter testified Natalie appeared to be "very confused about why she was being placed" in foster care, but she said "her mother was exhausted with her behaviors." Natalie told Nutter she had been "woken up that morning and her mother brought her to the front of the

3

building and told her to report to the fourth floor and look for Ms. Nutter." Natalie told Nutter "she walked into the building alone."

Nora told a different story at the hearing. She claimed Natalie asked defendant to take her to the Division, which was a request Natalie had made frequently for "years" when she was "really upset." Defendant could not find parking when the family arrived at the Complex, so she parked in a pedestrian crosswalk and instructed Nora to bring Natalie to the office on the third floor and ask for "Ms. Heather." A security guard directed Nora to the fourth floor, where Nora "watched [Natalie] walk to the door and put her hand on the door." Natalie told Nora she was "a little bit" nervous. Nora did not accompany Natalie to "Heather's" office.

On the day of the incident, Nutter and Watts spoke with defendant telephonically. Defendant, who remained outside in her parked car, confirmed she wanted the Division to place Natalie in foster care. Defendant told Nutter and Watts she could no longer tolerate her daughter's recalcitrant behavior and did not have relative resources to care for her. She refused the workers' attempts to provide reunification services, acknowledging her conduct would spur an investigation and court action.

Defendant's testimony at the hearing largely corroborated Nora's account. Assuming parking would be difficult at the Complex, defendant instructed Nora to accompany Natalie "to the third floor, to ask for Mrs. Watts." Apparently, defendant "didn't remember" Nutter's first name, but she knew the first name of "the supervisor and the worker . . . was Heather . . . [and defendant] remember[ed] Mrs. Watts's last name. So that's specifically who [defendant] told [Nora] to ask for." Defendant said she remained in the car because it was parked in the crosswalk and Nora was not a licensed driver.

At the conclusion of the hearing, the judge rendered an oral decision and issued the order under review. The judge credited the testimony of the Division's witnesses, concluding they were credible. Because Nora was "very protective of her mother" the judge found her account was "somewhat not credible." Citing defendant's detailed description of her efforts to change Natalie's behavior, the judge noted defendant was "an extremely compelling witness." But, the judge determined defendant's actions on the day of the incident were inexcusable.

The judge elaborated:

> Whether it was out of frustration, a last resort, a desperate act, . . . leaving an [eleven-]year[-]old child to make her way is just not an appropriate way to handle it. Assuming the mother's testimony is accurate that the child threatened to go to [the Division], does not mean

A-5577-17T3

that the child should [ha]ve been dropped off at [the Division] in the same manner.

. . . .

When [Natalie] was dropped off, she was alone. No one stayed with her. No one watched her go into the offices. No one helped her find Ms. Nutter or Ms. Watts. No one called the Division to say that this [eleven-]year[-]old girl was coming. Again, this is an [eleven-]year[-]old girl who was left alone with three backpacks in which she had her underwear, toiletries, clothing just like she was going somewhere to stay.

The judge determined defendant's "act was willful and want[on], and [she had] reckless disregard for the care of her child." Citing Natalie's track record for defiance and running away, the judge reasoned the child "could [ha]ve gotten involved in any number of dangerous situations." According to the judge, "[j]ust because th[e] building has officers in it . . ., there are other things going on here, and there [wa]s no guarantee that the child would [ha]ve walked in[to]" the Division's office.

The judge further found defendant's conduct was intentional and created a substantial risk of harm to Natalie:

This [c]ourt feels the frustration of [defendant]. It was evident in everything she said. But this is clearly no way to handle such a situation . . . . I do [not] doubt that her actions were out of frustration. But this [c]ourt is constrained to find that this was the intentional act of

6

[defendant]. It had happened once before. She knew exactly what she was doing.

[Defendant's] plan that morning was to take [Natalie] with her backpack, her three backpacks full of her clothing needs and drop her off at the Division's offices to find a former worker so that someone else c[ould] take care of her child. Unfortunately, that act alone, that act of dropping her off with no provisions being made for her, put this child at a substantial risk of harm.

On appeal, defendant presents the following contentions for our consideration:

[POINT I]

[THE DIVISION] FAILED TO PROVE THAT [DEFENDANT] WAS GROSSLY NEGLIGENT AND PUT [NATALIE] IN IMMINENT DANGER WHEN [ELEVEN]-YEAR-OLD [NATALIE] WAS LEFT BRIEFLY UNATTENDED ON THE FOURTH FLOOR OF THE WILENTZ JUSTICE COMPLEX BY [DEFENDANT]'S [NINETEEN]-YEAR-OLD DAUGHTER

A. [The Division] Failed to Prove that [defendant] did not Exercise a Minimum Degree of Care as Required by the Abuse and Neglect Statute.

B. [Natalie] was not Harmed and was not in Imminent Danger of Being Harmed when Left Briefly Without Supervision on the Fourth Floor of the Wilentz Justice Complex.

7

We find insufficient merit in these arguments to warrant extended discussion in our written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons expressed in the judge's cogent decision. We add the following remarks.

Our standard of review of the Family Part's fact-finding determination is limited. N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011). On appeal from orders issued in Title Nine cases, we accord considerable deference to the trial court's credibility determinations and findings of fact, as long as those findings are supported by "competent, material and relevant evidence." N.J.S.A. 9:6-8.46(b); see also N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369-70 (2017).

We intervene only "if the trial court's conclusions are 'clearly mistaken or wide of the mark . . . .'" N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 227 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). We also owe no deference to the trial court's legal conclusions, which we review de novo. State v. Smith, 212 N.J. 365, 387 (2012).

Title Nine cases are fact-sensitive, and the court should "base its findings on the totality of circumstances . . . ." N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). Notably, the Title Nine proof

standard is less stringent than in guardianship cases for the termination of parental rights, which instead must be proven by clear and convincing evidence. See R.D., 207 N.J. at 113.

Pertinent to this appeal, an "abused or neglected child" under Title Nine means

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

A court need not wait until a child is actually harmed or neglected before it can act in the welfare of that minor. N.J. Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235 (App. Div. 2009) (Carchman, J., concurring). "In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 23 (2013) (citing N.J.S.A. 9:6-8.21(c)(4)(b)). "Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive and must be resolved on a case-by-

case basis." N.J. Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 192 (2015).

"'[M]inimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). "[A] guardian [or parent] fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." A.B., 231 N.J. at 369 (citing G.S., 157 N.J. at 181). In essence, a parent is held to what "an ordinary reasonable person would understand" when considering whether the situation posed a risk and whether the parent nevertheless acted "without regard for the potentially serious consequences . . . ." G.S., 157 N.J. at 179.

Defendant primarily argues Natalie was not in imminent danger when Nora briefly left her unattended on the fourth floor of the Complex. Defendant attempts to shift the blame to Nora, claiming the nineteen-year-old did not follow her instructions. Defendant also claims "[t]he only reason why [Nora] was given care of [Natalie] is because [defendant] had to find parking" and Nora was not licensed to drive. Defendant's arguments misapprehend the totality of

the judge's decision, her own admissions, and her failure to provide Natalie with proper supervision.

Although the judge cited the imminent danger Natalie faced when she was left unattended in the Complex, Nora's actions were not under scrutiny. Rather, it was defendant, who failed to adequately supervise her eleven-year-old daughter. At the very least, defendant's conduct was grossly negligent. Well-aware of her daughter's tendency to run from authority, defendant nonetheless failed to make prior arrangements with the Division or personally accompany Natalie to the office, thereby subjecting her daughter to substantial risk of harm.

More telling, this incident was not defendant's first attempt to place her daughter in foster care, evincing – as the judge found – her actions were intentional. This time, however, defendant was unwilling to permit Natalie to return home or engage in reunification services. Instead, defendant shunned her parental responsibility by leaving Natalie at the Complex without, at a minimum, first ensuring she was safely in the Division's care and custody.

Applying our limited scope of review and well-established legal standards, we are satisfied there was competent, credible evidence in the record to support the judge's finding that defendant abused or neglected Natalie by leaving her unsupervised at the Division's office to be placed in foster care. The

A-5577-17T3

totality of the circumstances cited by the judge support her conclusion that the child was abused or neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION